**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**FRANCES ALICE TINNEY,**

     **Plaintiff,**

v.                       **Case No.: 2:17-cv-03628**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11). The undersigned has fully considered the evidence and arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and that this case be **DISMISSED** and

1

removed from the docket of the Court.

## I.    Procedural History

On March 19, 2014, Plaintiff, Frances Alice Tinney ("Claimant"), completed an application for DIB, alleging a disability onset date of June 1, 2010 due to a herniated disk in her back, osteoarthritis, depression, bursitis, psoriasis, and high blood pressure. (Tr. at 146-47, 161). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 21). Claimant filed a request for an administrative hearing, which was held on May 18, 2016, before the Honorable Christina Young Mein, Administrative Law Judge ("ALJ"). (Tr. at 36-62). At the hearing, Claimant amended her alleged onset date to November 1, 2013 and added carpal tunnel syndrome and fibromyalgia as causes of her disability. (Tr. at 40). By written decision dated July 5, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 21-31). The ALJ's decision became the final decision of the Commissioner on May 23, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 10, 11, 12). Consequently, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 47 years old on her alleged amended onset date and 48 years old on December 31, 2014, her date last insured. She has a high school education, completed one year of college, and communicates in English. (Tr. at 160, 162). Claimant worked for sixteen years as a teacher's assistant at a preschool. (Tr. at 162).

### III.  <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed

4

mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 23, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since November 1, 2013, her amended alleged onset date, through her date last insured. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoarthritis/knee degenerative joint disease, left shoulder degenerative changes/tendinopathy of rotator cuff, hypertension, psoriasiform dermatitis, degenerative disc disease, carpal tunnel syndrome, and fibromyalgia." (*Id.,* Finding No. 3). The ALJ also considered Claimant's restless leg syndrome, gastroesophageal reflux disease ("GERD"), obesity, and mental impairments, but determined that these impairments were non-severe. (Tr. at 24-25). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 25-26, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except no climbing of ladders, ropes or scaffolds; kneeling; crouching; crawling or reaching overhead. She could occasionally climb ramps and stairs, balance and stoop. She could frequently handle and finger. She could occasionally tolerate extremes of cold and heat, wetness and vibration. She could not work with hazardous machinery or at unprotected heights.

(Tr. at 26-29, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform her past relevant work. (Tr. at 29, Finding No. 6). Therefore, under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 29-30, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1966 and was 48 years old, which placed her in the category of a younger individual age 45-49; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules (the "Grids") supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 29-30, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 30, Finding No. 10), including work as a printed circuit board assembler, a batcher for wire goods, and a document preparer. (*Id.*). Accordingly, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act. (Tr. at 31, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises one overarching challenge to the Commissioner's decision; she argues that the ALJ erred by inadequately evaluating the effects of Claimant's fibromyalgia on her ability to work, in contravention of Social Security Ruling ("SSR") 12-2p. (ECF No. 10 at 9). According to Claimant, the ALJ's error is first apparent at step three of the sequential disability determination process when she makes no effort to analyze Claimant's fibromyalgia in combination with her other severe impairments. Claimant maintains that the ALJ compounded this error by not considering the pain and fatigue associated with fibromyalgia when assessing Claimant's RFC. Claimant contends that the

ALJ ignored or dismissed significant evidence of Claimant's worsening symptoms and judged Claimant's credibility to be lacking without providing any logical explanation for that negative determination. Claimant asserts that the ALJ's discussion of Claimant's fibromyalgia was so wholly deficient that the Court is precluded from determining whether the Commissioner's decision is supported by substantial evidence. Therefore, Claimant asks the Court to reverse the Commissioner's decision and remand the case to allow further assessment of how Claimant's fibromyalgia impacts her capacity to work.

In response, the Commissioner disagrees with Claimant's representation that the ALJ failed to adequately consider Claimant's fibromyalgia. The Commissioner points out that the ALJ explicitly based her RFC determination on the limitations caused by Claimant's fibromyalgia. (ECF No 11 at 9). Indeed, the ALJ explained that while she gave great weight to the opinions of the agency experts, who found Claimant capable of a reduced range of light level work, the ALJ felt that the evidence of Claimant's "fibromyalgia and musculoskeletal condition" substantiated the existence of slightly greater physical restrictions. (*Id.*). For that reason, the ALJ limited Claimant to a reduced range of sedentary work—the least physically demanding work available under the Social Security regulations. The Commissioner adds that the evidence of record does not establish any greater level of disability; thus, the reasons for the ALJ's decision are clear. Furthermore, the Commissioner argues that substantial evidence supports the ALJ's conclusion of non-disability; consequently, the decision should be affirmed.

## V.    **Relevant Evidence**

The undersigned has reviewed all evidence of record; however, only the notations most relevant to the disputed issues are summarized below:

### A. Treatment Records

On September 23, 2013, Claimant presented to the Roane General Hospital Medical Clinic for follow up of GERD and hypertension. (Tr. at 275-78). She reported doing well on her current medications. Her review of systems was positive for joint pain and swelling, but she denied any constitutional symptoms. She appeared comfortable. An examination was negative for abnormal findings. She had no clubbing, cyanosis, or edema of her extremities. Claimant requested medication refills, and received an order for laboratory studies and a rheumatology consultation for polyarthritis.

On November 20, 2013, Dr. Michael Istfan, a rheumatologist, saw Claimant in follow up of her osteoarthritis, tendinopathy, arthralgia, long-term use of non-steroidal anti-inflammatory medications, and restless leg syndrome. (Tr. at 246-48, 416-18). Claimant reported that she was doing fairly well overall, although she still had aches and pains—mainly in her elbows—and swelling in her hands, primarily at the PIP joints. She experienced mild morning stiffness that lasted about thirty minutes, but had no new physical limitations or problems with medications. Claimant looked well and was in no acute distress. On examination, Claimant had a normal range of motion of her shoulders with some pain on abduction of the right shoulder; her elbows were mildly, diffusely tender, but range of motion was normal; and there was mild soft tissue swelling at the right second and fifth PIP joints with tenderness. Her hips and knees were not tender, with normal range of motion. Her knees had no synovitis, although mild patellofemoral crepitus was present in the left knee. Dr. Istfan assessed Claimant's osteoarthritis as stable, but felt that the soft tissue swelling at her PIP joints might be a symptom of a sudden inflammatory process. He decided to discontinue Claimant's prescription of Sulindac and replace it with Mobic. He increased her dosage of Neurontin for treatment

of restless leg syndrome.

Claimant presented to the Roane General Hospital Medical Clinic on January 20, 2014, complaining of a swollen, painful knot on her left knee. (Tr. at 266-69). She stated that she injured her knee before Christmas, and it became swollen and red. She was seen at Urgent Care and prescribed Augmentin and Prednisone. The redness and heat lessened, but her knee remained tender. Claimant also had joint swelling and stiffness, but no limitation of range of motion, and she denied any constitutional symptoms, such as fever or fatigue. A physical examination revealed a solid mass protruding from Claimant's left patella area that contained palpable fluid. The mass was tender; however, range of motion was intact. Claimant was diagnosed with knee pain and swelling and given prescriptions, including scripts for antibiotics, and an order for knee x-rays.

Claimant went to the Weston Orthopedic and Sports Medicine Center on February 10, 2014 to see Dr. Joseph Snead. (Tr. at 300-02). She complained of pain in her anterior left knee, which began after a fall on Christmas day. Claimant denied having locking or catching of the knee, but indicated that her knee swelled after the fall. She received antibiotics, and her knee improved, but the pain persisted. Dr. Snead performed an examination, noting no evidence of effusion, erythema, or significant swelling in either knee. Claimant had full range of motion bilaterally with tenderness directly over the left patella. Her ligaments appeared stable, and a McMurray's test of both knees was negative. Strength, sensation, and perfusion were intact. Dr. Snead diagnosed Claimant with prepatellar bursitis and degenerative joint disease. He felt the bursitis was resolving nicely and did not believe Claimant required any treatment.

On March 10, 2014, Claimant presented to Roane General Hospital Medical Clinic and saw Wendy Beall, Family Nurse Practitioner, for treatment of hypertension and

GERD. (Tr. at 257-61, 294-98). On a review of systems, Claimant denied having any constitutional symptoms (appetite change, fatigue, weight change), joint pain, joint swelling, muscles aches, muscle swelling or stiffness. Her extremities were negative for edema. She also denied having abnormal gait, numbness, focal weakness, or incoordination, and no neurological abnormalities were noted.

Claimant returned to Dr. Istfan's office on April 2, 2014, stating that she had done somewhat poorly since her last visit with more prominent aching in multiple joints. (Tr. at 249-51, 340-42). She had suffered a bout of swelling and redness in her left knee that was thought to be infectious and was treated with antibiotics, but had residual pain. Claimant was given prednisone, which did not help. She saw an orthopedist, who thought Claimant's problems were caused by osteoarthritis and bursitis. Claimant also complained of significant shoulder, elbow, and hip discomfort, as well as intermittent swelling of the wrists. She felt some numbness involving the hands and forearms that was exacerbated by driving and using the telephone. The numbness woke her up at night. Claimant reported poor sleep patterns and fatigue, but denied skin rash or peripheral edema. An examination revealed normal range of motion of the shoulders, hips, elbows, and wrists. However, she had pain in her right shoulder on abduction; mild diffuse tenderness of her elbows; positive Tinel's sign bilaterally; soft tissue swelling of the second and fifth PIP joint on the right; mild PF crepitus on the left knee; and multiple positive fibromyalgia trigger points. Dr. Istfan found Claimant to be considerably more symptomatic, with little in terms of inflammatory synovitis on examination. He suspected that her symptoms were due to osteoarthritis, fibromyalgia, and localized inflammation with a recent onset of carpal tunnel syndrome, although he needed to rule out endocrine disease or systemic inflammation. He decided to increase Claimant's dosages of Mobic

and Neurontin and ordered laboratory studies.

On August 5, 2014, Claimant returned to Dr. Istfan for follow-up of her osteoarthritis, fibromyalgia, and carpal tunnel syndrome. (Tr. at 343-45). She complained of pain on left shoulder abduction and of right anterior knee pain. She also had generalized aches and pains. Claimant described her hand strength and grip as stable, stating that the use of night splints helped with hand/wrist pain, numbness, and tingling. She also received partial relief with Aleve and continued to take Neurontin, but discontinued Mobic, because it was not helping. On examination, Claimant had pain with left shoulder abduction and rotation; mild shoulder limitation; normal wrist rotation without tenderness or synovitis, but with a positive Tinel's sign bilaterally; tender joint lines in the knees with some crepitus on the left; and diffuse muscle and joint tenderness with multiple fibromyalgia trigger points. Dr. Istfan felt Claimant's shoulder and knee pain were mostly due to osteoarthritis. He encouraged her to try glucosamine and indicated that she could consider an injection for any particularly bothersome area. He kept Claimant on Neurontin for fibromyalgia and told her to continue using her braces for carpal tunnel syndrome.

Claimant had cervical spine x-rays taken on September 17, 2014. (Tr. at 317). The films showed degenerative changes, including calcification inferior to the anterior arch of the C1, which was likely just degeneration, but could also signify calcific tendinitis. Lumbar spine x-rays taken nine days later showed moderate degenerative changes, particularly at the L4-5, but no compression deformity. (Tr. at 323).

### B.  Evaluations and Opinions

On May 12, 2014, Saima Noon, M.D., completed a Physical Residual Functional Capacity Assessment form at the request of the SSA based upon a review of Claimant's

disability file. (Tr. at 68-69). Dr. Noon opined that Claimant could occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; stand and/or walk six hours in an eight-hour work day; sit about six hours in an eight-hour work day; and push and pull an unlimited amount within the weight limitations previously stated. Claimant was limited to only occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; stooping, kneeling, crouching, and crawling. However, she had no manipulative, visual, or communicative limitations. Dr. Noon felt Claimant should avoid concentrated exposure to extreme temperatures, wetness, vibrations, and hazards, but had no restrictions with respect to her exposure to humidity, noise, fumes, odors, dusts, gases, and poor ventilation.

Dr. Fulvio Franyutti reviewed Claimant's file on June 16, 2014 to evaluate the propriety of Dr. Noon's RFC assessment. (Tr. at 80-82). Dr. Franyutti agreed with the function-by-function determinations made by Dr. Noon. Thus, he affirmed Dr. Noon's RFC assessment as written. (*Id.*).

On July 1, 2014, Claimant presented to Kara Gettman-Hughes, M.A., for a mental status examination at the request of the West Virginia Disability Determination Service. (Tr. at 305-09). Ms. Gettman-Hughes observed that Claimant walked with an unsteady gait, but traveled alone the thirty miles to the appointment. Claimant explained that back problems, fibromyalgia, arthritis, carpal tunnel syndrome, bursitis, and psoriasis caused her to apply for disability benefits. She stated that her hands hurt; she dropped things; walking hurt; she could not bend over; her toenails fell off; and she had blisters on her feet. Claimant complained of chronic pain and functional limitations, as well as emotional distress. She expressed great frustration over her pain and resulting limitations, indicating that she felt sad at no longer being able to do housework and yardwork.

Claimant reported that her husband had become disabled in 2013, and she had grown excessively worried ever since. Claimant last worked as a teacher's aide and had stayed at that job for sixteen years.

On mental status examination, Claimant had mildly impaired concentration, moderately impaired persistence, and normal pace. Her social functioning was mildly impaired. Ms. Gettman-Hughes assessed Claimant with Pain Disorder associated with both psychological factors and a mental condition and with Generalized Anxiety Disorder. Ms. Gettman-Hughes recorded Claimant's activities as including the following: arising at around 8:00 a.m.; performing activities of daily living; doing some household chores; walking to the end of the road for exercise; watching television; eating meals; shopping and running errands a few times per week; eating out once or twice per week; speaking on the telephone; visiting friends or family once or twice per week; sewing and gardening; attending medical appointments; periodically attending church; seeing a movie twice per year; and managing the household finances with the help of her husband. Claimant's prognosis was assessed as poor.

### C. Claimant's Statements

In an Adult Function Report dated March 31, 2014 , Claimant stated that she could do both indoor and outdoor chores with limited ability. (Tr. at 172) She could attend to her daily grooming activities with some pain and discomfort; could make small meals and occasionally a full meal; could shop for groceries or clothes once or twice per week; and went outside daily. (Tr. at 172-73). Claimant watched television daily and sewed when she felt up to it. (Tr. at 174). She spent time with her mother and daughters and had no trouble paying attention. (Tr. at 174-75). However, most physical activities caused pain, and she could not walk more than 75 yards without needing to rest. (Tr. at 175).

Claimant supplemented her Adult Function Report in June 2014, stating that she had trouble standing and sitting for long periods of time without changing position. (Tr. at 186). She was unable to bend down on her knees, use her arms overhead, or grip objects. Claimant continued to have difficulties when completing her daily activities, although she performed them without assistance. (Tr. at 187). She continued to make light meals and do light household and outdoor chores. (Tr. at 188-89). Claimant indicated that she was able to shop once or twice per week, could drive, and went outside daily. (Tr. at 189). She was not able to sew as much, or watch as much television, but she continued to spend time with her family and attended church and family gatherings. (Tr. at 190). Claimant's ability to engage in physical activity had not improved; to the contrary, she was experiencing more difficulty with walking, kneeling, lifting, and standing. (Tr. at 191). Claimant stated that in April 2014, she was prescribed wrist splints for both wrists due to carpal tunnel syndrome, which she wore every night. She added that while she could still do chores and other activities, it took her much longer to complete them. (Tr. at 193).

At the administrative hearing on May 18, 2016, Claimant testified that she had a valid driver's license and drove about three days per week to run errands. (Tr. at 42). Claimant indicated that she quit working, because her job as a teacher's aide required a lot of physical activity that was becoming increasingly more difficult for her to do. At present, she found it difficult to sit or stand for long periods of time, walk long distances, hold on to items, bend on her knees, bend over, and reach above her head. (Tr. at 45-46). Claimant stated that she took medications for her conditions, which caused drowsiness and lightheadedness. (Tr. at 47). She needed surgery for carpal tunnel syndrome, but was undecided about proceeding, because she was fearful of surgery. (Tr. at 48). When asked to describe a typical day, Claimant testified that she got up in the morning, started a pot

of coffee, stretched, and rested. She walked outside on her porch and checked her flowers, talked with her husband, walked down the driveway, did a load of laundry, completed some light household chores, maybe fixed a meal, went to the post office or to get groceries, watched the news or a television show, and after dinner, got ready for bed. (Tr. at 48-49). Claimant denied belonging to any clubs or groups, and did not attend church regularly. She occasionally visited with friends or relatives, gardened, and sewed when she felt up to it. (Tr. at 49-50). Claimant had been on one vacation since her alleged onset of disability; in June 2015, she and her husband spent four days in Pigeon Forge.

When examined by her attorney, Claimant testified that she could not sew or quilt for more than 10 or 15 minutes at a time before her hands would become numb, and she would have to stop and stretch them. (Tr. at 51). Claimant described having trouble holding things, like dishes, stating that she had to be very careful when washing them or she might drop them. She indicated that her fingers often swelled due to inflammation, and they were painful. Claimant also testified that she had pain in her shoulders that made it difficult for her to reach and lift. She was capable of carrying a five-pound laundry basket comfortably, but had difficulty carrying a gallon of milk. (Tr. at 53-54). Claimant also described having trouble sitting or standing more than twenty minutes at a time, stating that she would feel pain in her back and knees. She could walk about fifty yards before having to rest, but she would have to walk slowly and would feel pain nonetheless. (Tr. at 56). Claimant stated that she used medication and cold packs for pain relief and that she rested when the pain was severe. (Tr. at 57-58).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v.

Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a

*de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v.

Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed

applicable regulations and rulings in reaching his decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with

such decision." *Blalock*, 483 F.2d at 775.

## VII.  __Discussion__

Claimant contends that the ALJ failed to comply with SSR 12-2p when evaluating

the effect of Claimant's fibromyalgia on her ability to work. As proof of her contention,

Claimant points to the ALJ's step three assessment and RFC discussion. Claimant argues

that the ALJ's one-sentence step three analysis is so clearly deficient of explanation that

it simply cannot satisfy the dictates of SSR 12-2p. In addition, Claimant asserts that the

ALJ made no mention of Claimant's widespread pain and fatigue, symptoms commonly

associated with fibromyalgia, when addressing her functional abilities in the RFC

assessment; instead, the ALJ perfunctorily dismissed Claimant's statements of disabling

pain as unreliable.

### A. SSR 12-2p

Social Security Ruling 12-2p provides guidance on (1) the evidence needed to establish that a claimant has the medically determinable impairment of fibromyalgia and (2) the manner in which an ALJ will evaluate evidence to determine the limiting effects of fibromyalgia. SSR 12-2p, 2012 WL 3104869 (S.S.A. 2012). Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id.* at *2. According to SSR 12-2p, to ascertain whether an adult with a medically determinable impairment of fibromyalgia is disabled, the ALJ will consider the impairment at each step of the five-step sequential disability determination process. *Id.* at *5.

As is relevant in this case, although fibromyalgia is not a listed impairment, at the third step of the process, the ALJ must determine whether fibromyalgia medically equals a listing, either alone or in combination with at least one other medically determinable impairment. *Id.* By way of example, SSR 12-2p suggests comparing the symptoms of fibromyalgia against the criteria of Listing 14.09D, the listing for inflammatory arthritis. If fibromyalgia does not medically equal any listed impairment, the ALJ must consider the functional effects of fibromyalgia in determining the claimant's RFC.

As part of the RFC analysis, the ALJ must assess the extent to which the symptoms of fibromyalgia limit the claimant's capacity for work. *Id.* When performing this assessment, the ALJ must examine all of the evidence in the case record, including the claimant's daily activities, medications, nature and frequency of treatment, and the claimant's statements about the severity, persistence, and disabling effects of her symptoms. SSR 12-2p provides that the ALJ will "follow the two-step process set forth in

[the] regulations and in SSR 96-7p" to determine the reliability of claimant's statements regarding the disabling effects of fibromyalgia. *Id.* Notably, SSR 12-2p does not require the ALJ to follow any different or special process in assessing the credibility of a claimant with fibromyalgia. Moreover, SSR 12-2p does not suggest that statements by a claimant with fibromyalgia should be given more weight simply because the condition does not always present with objective findings. Instead, SSR 12-2p expressly provides that once the diagnosis is established, the ALJ should follow precisely the same process for determining the credibility of statements regarding pain and other symptoms by a claimant with fibromyalgia that is customarily used with any claimant.

### B.  Step-Three Finding

A claimant should be found disabled at the third step of the sequential evaluation process when her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that her impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that her impairments are medically equivalent to the listed impairment.

18

To establish medical equivalency, a claimant must present evidence that her impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The

claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Here, the ALJ found that Claimant had severe impairments, including osteoarthritis/knee degenerative joint disease, left shoulder degenerative changes/tendinopathy of rotator cuff, hypertension, psoriasiform dermatitis, degenerative disc disease, carpal tunnel syndrome, and fibromyalgia. (Tr. at 23). At step three of the process, the ALJ concluded that none of Claimant's impairments met or medically equaled a listed impairment "including 1.02 or 1.04." (Tr. at 26). The ALJ provided no further explanation or written analysis at that point in the decision.

Claimant is critical of the ALJ's step three assessment, because the ALJ allegedly failed to identify the relevant listings she considered and failed to "compare each of the listed criteria to the evidence of the claimant's symptoms," setting forth the reasons for the step-three determination. (ECF No. 10 at 11). However, as the Commissioner points out, the first aspect of Claimant's criticism is without merit, because the ALJ explicitly identified two Listings, 1.02 and 1.04, and expressly stated that Claimant's symptoms did not meet the criteria of those listed impairments. Claimant has not asserted that any other listed impairments should have been considered by the ALJ.

As to the second aspect of Claimant's criticism, whether that aspect has merit depends largely upon how and where in the written decision the ALJ must convey a basis for her step-three determination. In *Radford v. Colvin,* the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") explained that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling." *Radford,* 734 F.3d 288, 295 (4th Cir. 2013) (citing *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984)). As such, the Fourth Circuit found that when an ALJ summarily

concludes that a claimant does not meet or medically equal a listing, without providing an explanation of which evidence the ALJ found credible and why, and without specific application of the pertinent legal requirements to the evidence, the ALJ's insufficient analysis "ma[kes] it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* (citing *Cook v. Heckler,* 783 F.2d 1168, 1173 (4th Cir. 1986). Notwithstanding this requirement (that an ALJ sufficiently articulate the reasons for her step-three finding), the Fourth Circuit clarified in *Keene v. Berryhill:*

> There is no requirement, however, that the ALJ provide an exhaustive point-by-point breakdown of each and every listed impairment. Rather, the ALJ is compelled to provide a coherent basis for his step-three determination. We must read the ALJ's decision as a whole. Indeed, courts have determined that an ALJ's step-three conclusion that the claimant did not meet the listing at issue can be upheld based on the ALJ's findings at subsequent steps in the analysis.

*Keene,* ____ Fed. Appx. ____ , 2018 WL 2059514, at *3 (4th Cir. May 2, 2018) (citation omitted). Courts in this district have similarly held that "an ALJ's 'failure to include a pertinent discussion of the evidence at step three of the analysis' is of no moment if the whole of the ALJ's decision provides substantial evidence to support the step three determination." *Turley v. Berryhill,* No. 2:17-cv-01915, 2018 WL 1314589, at *3 (S.D.W. Va. Mar. 14, 2018) (quoting *Marcum v. Berryhill,* No. 16-2297, 2017 WL 1095068, at *3-4 (S.D.W. Va. Mar. 23, 2017)); *see also Hawkins v. Berryhill,* No. 2:16-cv-9131, 2018 WL 1557263, at *3 (S.D.W. Va. Mar. 30, 2018) (holding that an ALJ need only review the medical evidence once in the decision; thus "a cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence  to support the conclusion.") (citations omitted); *and Six v. Colvin,* No. 3:15-cv-14377, 2016 WL 7040850 (S.D.W. Va. Dec. 1, 2016). Consequently, the fact that the written decision in this case includes only a

one-sentence, conclusory explanation at step three is not determinative of the sufficiency of the step-three analysis. Instead, when evaluating the merits of Claimant's challenge to the step-three finding, the undersigned must examine the whole of the written decision and ascertain whether a coherent basis exists for the ALJ's step-three finding and whether that basis is supported by substantial evidence.

Paragraph 1.00 of the Listing pertains to the musculoskeletal system. As the ALJ explained in the written decision, Claimant attributed her inability to work to problems related to her musculoskeletal system; such as, knee, back, shoulder, elbow, and finger pain. (Tr. at 26-27). The ALJ noted that Claimant had aching joints, regional inflammation, and morning stiffness, and she had been diagnosed with osteoarthritis, fibromyalgia, carpal tunnel syndrome, and degenerative disc/bone changes. (Tr. at 26-28). Thus, contrary to Claimant's contention, the ALJ understood and acknowledged that Claimant had symptoms related to fibromyalgia, and the ALJ considered those symptoms throughout the disability determination process. Given the emphasis placed on the musculoskeletal system by Claimant and her treating physicians, the ALJ very logically considered Listings 1.02 and 1.04, the relevant listed impairments in that body system.

To equal Listing 1.02, Claimant was required to demonstrate a serious loss of function involving either her upper or lower extremities. 20 C.F.R. § Pt. 404, Subpt. P, App 1, ¶ 1.02. The loss of function could be due to "bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries ... requiring prolonged periods of immobility or convalescence." 20 C.F.R. § Pt. 404, Subpt. P, App 1, ¶ 1.00 B.1. However, regardless of cause, the loss of function had to involve either an "inability to ambulate effectively on a sustained basis" or an 'inability to perform fine and

gross movements effectively on a sustained basis." *Id.* at ¶ 1.00 B.2.a. In the relevant Listing, an inability to ambulate effectively meant "an extreme limitation of the ability to walk ... generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* at B.b.(1). The inability to perform fine and gross movements meant "an extreme loss of function of both upper extremities." *Id.* at B.c. Examples of extreme loss of function of gross and fine movements included the inability to "prepare a simple meal and feed oneself, the inability to take care of personal hygiene, [and] the inability to sort and handle papers or files." *Id.*

To equal Listing 1.04, Claimant was required to show a disorder of the spine resulting in compromise of a nerve root or the spinal cord, with (a) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, accompanied by sensory or reflex loss, and positive straight-leg raising test if the lower back is involved, or (b) spinal arachnoiditis confirmed by objective finding, manifested by severe burning or painful dysesthesia, resulting in the need to change positions frequently, or (c) lumbar spinal stenosis resulting in pseudoclaudication, found on medical imaging, manifested by chronic nonradicular weakness and resulting in an inability to ambulate effectively. While these symptoms did not need to all be present at the same time, medical findings of equal severity must all have been present at some point during the pertinent thirteen-month period in order for the listed impairment to be met.

The ALJ thoroughly reviewed Claimant's medical records, treatment choices, statements, and activities in the written decision. The ALJ indicated that Claimant was able to walk to the end of her driveway for exercise, sew, garden, prepare meals, clean the

house, do laundry, shop at the grocery store, vacuum, pay bills, complete daily hygiene, and drive. (Tr. at 24). While she had some difficulty with performing physical activities and had to do them more slowly, she was capable of completing tasks unassisted, using both her arms and her legs.

As for Claimant's medical findings, she had aches and pains, morning stiffness that lasted thirty minutes, and some swelling, but she generally had a normal range of motion, without effusion or edema, of all of her extremities. (Tr. at 27). The ALJ noted that on November 20, 2013, Claimant's main complaint was elbow pain. She looked well at the appointment with her rheumatologist and had a normal range of motion of her shoulders, elbows, hips, and knees. (*Id.*). On March 10, 2014, Claimant complained of more symptoms, but had little change in her objective findings. Her tenderness was described as diffuse, but mild, and she had a normal range of motion. (Tr. at 28). On August 5, 2014, Claimant had left shoulder pain with abduction, resulting in some limitation with rotation, but she had no evidence of synovitis. X-rays taken of Claimant's cervical spine in September 2014 showed mild degenerative changes. (*Id.*). The ALJ indicates that while Claimant had chronic pain and sought appropriate treatment for her symptoms, neither the medical findings, nor Claimant's activities reflected disabling limitations during the relevant period between November 1, 2013 and December 31, 2014. (*Id.*).

Clearly, the discussion provided by the ALJ provides an adequate explanation for her determination that Claimant did not meet or equal Listing 1.02. The record is devoid of evidence that Claimant had any serious difficulty walking. She did not use a hand-held device and certainly never required assistance with ambulation that limited the functioning of both of her upper extremities. The record is equally devoid of evidence demonstrating that Claimant had an extreme loss of function of both upper extremities.

Although her shoulders hurt on abduction periodically, Claimant was able to prepare meals, sew, perform housework, bathe daily, and complete her other grooming activities. Accordingly, the record conclusively established that Claimant did not meet the loss of function component of Listing 1.02.

Claimant similarly lacked evidence of neurological, motor, reflex, and sensory impairment to meet the requirements of Listing 1.04. As reflected in the clinical records, discussed by the ALJ, Claimant's medical imaging did not show stenosis, nerve root compression, or spinal arachnoiditis. Indeed, Claimant had few complaints about her thoracic or lumbar spine and made no documented complaints of radicular pain. The range of motion in her hips and legs was typically normal; she had no documented straight-leg raising tests; and her sensory, muscle strength, and reflex testing were normal. Therefore, Claimant's clinical findings and symptoms, taken as a whole, do not equal the severity of the criteria described in Listing 1.04.

Although Claimant does not expressly allege that the ALJ should have examined Claimant's fibromyalgia against the criteria of Listing 14.09D, SSA 12-2p includes that listed impairment as an example of an analogous listing for fibromyalgia. Assuming *arguendo* that the ALJ should have considered Listing 14.09D given its mention in SSR 12-2P, the ALJ's failure to do so was harmless error, because the written decision provides a clear rationale for rejecting that Listing as a basis for disability. In order to equal Listing 14.09D, Claimant must establish that she has repeated manifestations of inflammatory arthritis, with at least two constitutional signs and symptoms (severe fatigue, fever, malaise, involuntary weight loss) and one of the following at the marked level:

1.    Limitations of activities of daily living.
2.    Limitations in maintaining social functioning.

      3.      Limitations in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App 1, ¶ 14.09D. While Claimant could demonstrate the presence of inflammatory arthritis, the record does not readily demonstrate the presence of two constitutional signs and symptoms. Moreover, the ALJ performed a thorough evaluation of Claimant's four broad mental functional areas and found no more than mild limitations in two of the three areas above, and no limitations in activities of daily living. Therefore, based on the written decision, Claimant did not meet Listing 14.09D.

In summary, when reading the ALJ's decision as a whole, the undersigned **FINDS** that the ALJ has provided an adequate explanation for her step-three finding. In addition, the undersigned **FINDS** that the ALJ did consider Claimant's fibromyalgia symptoms in determining whether her impairments met or equaled any of the impairments contained in the Listing. Finally, the undersigned **FINDS** that substantial evidence supports the ALJ's determination that Claimant's impairments, singly or in combination, do not meet or equal the severity criteria of any listed impairment.

### C. RFC Finding

Claimant argues that the ALJ performed an insufficient RFC assessment, because she failed to fully consider evidence of Claimant's widespread pain and fatigue caused by fibromyalgia and discounted Claimant's credibility without building a logical bridge between the evidence relating to fibromyalgia and the credibility finding. (ECF No. 10 at 12). Claimant relies on this Court's decision in *Cale v. Colvin,* 2016 WL 4541947 (S.D.W. Va. Aug. 31, 2016), as support for her position that this case should be remanded so that the impact of Claimant's fibromyalgia can be considered at each step of the sequential process. In response, the Commissioner contends that the ALJ fully complied with Social

Security rules and regulations in conducting the RFC assessment and, contrary to Claimant's representation, the ALJ expressly took into account the effects of Claimant's fibromyalgia. As proof, the Commissioner points to the ALJ's statement that she found Claimant to be more restricted than opined by the agency consultants, *because of Claimant's fibromyalgia* and musculoskeletal condition. (ECF No. 11 at 9). The undersigned agrees with the Commissioner.

Social Security Ruling ("SSR") 96-8p provides guidance on how an ALJ should properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 404.1545(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed;

(2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

As part of the RFC assessment, the ALJ will consider the claimant's statements regarding the effects of his or her symptoms. Under the applicable Social Security rulings and regulations, the ALJ uses a two-step process to evaluate these statements. 20 C.F.R. § 404.1529. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL

374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In its rulings, the SSA provides further guidance on how to evaluate a claimant's credibility, stating, "[o]ne strong indication of the credibility of an individual's

statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ carefully reviewed the medical records from the relevant time period, as well as Claimant's statements regarding her daily and weekly activities and the opinion evidence. The ALJ acknowledged that Claimant had joint swelling, morning stiffness, diffuse pain and tenderness, and localized inflammation caused by osteoarthritis, fibromyalgia, and carpal tunnel syndrome. She commented that Claimant regularly received treatment and continued to seek relief from her symptoms. The ALJ took into account Claimant's statements regarding her difficulties with walking, bending, reaching, kneeling, sitting, standing, and carrying, but observed that, nonetheless, Claimant was able to perform many activities, albeit at a slower pace and with some discomfort. The ALJ did not believe that Claimant's daily activities were limited to the extent one would expect given her statements of disabling symptoms. Moreover, the clinical findings did not support the extreme physical limitations described by Claimant. The medical imaging primarily showed mild to moderate degenerative changes, and the examinations revealed normal range of motion with the remainder of the findings being normal or only mildly abnormal. The ALJ noted that none of Claimant's treating physicians recommended restrictions on her activities, which would be expected if her claims of disabling impairments were entirely credible. (Tr. at 29). Finally, the ALJ examined the statements of the agency medical consultants, who opined that Claimant could perform a reduced level of light exertional work. Given this evidence, the ALJ found Claimant's statements to be less then fully credible, concluding that "that record fails to show how [Claimant] had limitations beyond those cited in her reduced sedentary residual functional capacity during November 1, 2013, to December 31, 2014." (Tr. at 28).

The ALJ's RFC discussion, including the credibility analysis, fully complied with Social Security regulations and with SSR 12-2p, SSR 96-7p, and SSR 96-8p. The ALJ

considered Claimant's abilities on a function-by-function basis, examining the objective medical evidence, opinion evidence, statements, and Claimant's regular activities. The ALJ used the two-step process to evaluate the reliability of Claimant's assertions of disabling symptoms, weighed the opinions, and reconciled conflicts in the evidence. Accepting to an extent Claimant's contention that the limitations to her physical abilities caused by fibromyalgia exceeded those determined by the medical source consultants, the ALJ crafted an RFC that incorporated greater limitations than recommended by the agency experts.

The ALJ's RFC finding is supported by substantial evidence. As she indicated, none of Claimant's treating physicians placed Claimant on activity restrictions. Her physical examinations, while not entirely normal, yielded few remarkable findings. She had little evidence of swelling or synovitis of the joints on examination, and her range of motion was usually normal. (Tr. at 247, 268, 296, 297, 300, 341). Claimant's x-rays were primarily notable for mild to moderate degenerative changes. (Tr. at 317, 323). She was able to walk short distances without resting, walked unassisted, and had normal sensory and reflex responses in her legs. (Tr. at 175, 191, 300, 308). Claimant was able to do a range of tasks, including gardening, sewing, walking, cooking, shopping, driving, vacuuming, and household finances. She attended church, visited with friends and family, kept doctors' appointments, and went on at least one vacation with her husband. Clearly, Claimant had serious physical limitations; for that reason, her RFC was reduced to the sedentary exertional level with additional postural, manipulative, and environmental restrictions. Accordingly, the ALJ recognized Claimant's limitations and fully accounted for them in the RFC findings.

In regard to Claimant's reliance on *Cale v. Colvin, supra,* the undersigned is not

persuaded given the differences between *Cale* and the instant case. In *Cale,* the ALJ listed the claimant's fibromyalgia as a severe impairment, and then never mentioned the condition again in the written decision. In contrast, the ALJ in the instant case discussed Claimant's statements regarding fibromyalgia; her symptoms of inflammation and widespread, diffuse pain; her treatment by Dr. Istfan, a rheumatologist; and her increase of symptoms presumably related to fibromyalgia. (Tr. at 26, 28). The ALJ explicitly adjusted Claimant's RFC finding, reducing the exertional level to sedentary to account for limitations "as a result of fibromyalgia and musculoskeletal" issues. (Tr. at 29). Therefore, unlike the ALJ in *Cale,* the ALJ in this case gave proper consideration to Claimant's fibromyalgia.

Wherefore, the foregoing reasons, the undersigned **FINDS** that the ALJ did not err in her treatment of Claimant's fibromyalgia in analyzing Claimant's RFC or in assessing her credibility. In addition, the undersigned **FINDS** that substantial evidence supports the ALJ's RFC finding, including the credibility assessment.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 11); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section

636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: July 2, 2018

Cheryl A. Eifert
United States Magistrate Judge